J-S06003-20

2020 PA Super 122

| IN THE INTEREST OF: T.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2291 EDA 2019 |

Appeal from the Order Entered July 10, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000093-2019

| IN THE INTEREST OF: T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2292 EDA 2019 |

Appeal from the Order Entered July 10, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000189-2017

BEFORE:  LAZARUS, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

OPINION BY LAZARUS, J.:                                    **FILED MAY 20, 2020**

M.A.W. (Mother) appeals from the trial court's orders[1] involuntarily terminating her parental rights to her minor daughter, T.M.W. (Child) (born 4/12), and changing the placement goal to adoption.  After careful review, we are constrained to vacate.

---

[1] Our Court consolidated the adoption and dependency docket numbers below for purposes of appeal.  **See** Pa.R.A.P. 513 (consolidation of multiple appeals).

The City of Philadelphia Department of Human Services (DHS) first became involved with Mother's family in September 2016 when it received a general protective services report concerning deplorable housing conditions and possible medical neglect of Child, who had been diagnosed with Sickle Cell Disease. Mother had taken Child to the emergency room at Children's Hospital of Philadelphia (CHOP), indicated to medical personnel that Child, who was then four-and-a-half years old, handled her own medications for her disease, and also informed hospital employees that the family home was infested with bedbugs.[2] Mother reported that the bugs were coming out of her skin and Child's skin. No bedbugs were observed by medical staff on either Mother or Child, raising concerns about Mother's mental health. DHS later met with Mother in her home; they did not observe bedbugs in the residence. Mother, however, insisted that the bugs were attacking her and Child, having entered their bodies through various orifices. Following the home visit, DHS implemented a rapid service response initiative, recommending that Mother use a bedbug eradication treatment for her home. Mother rejected this recommendation, insisting that DHS provide her a more

_____

[2] Mother testified that in the fall of 2016, when DHS first became involved with her family, she was taking several prescription medications for skin irritations due to bug bites. N.T. Termination Hearing, 6/4/19, at 146-48. Mother noted that these medications made her behavior "uncontrollable" and made her "drowsy, unable to focus, sluggish [and] tired." *Id.* at 150-51. Mother testified that she stopped taking these medications after her emergency room visit at CHOP in November 2016. *Id.* at 151.

expensive treatment administered by the exterminator of her choosing. When DHS refused, Mother decided to self-exterminate.

On January 30, 2017, Child was adjudicated dependent and committed to DHS's custody. In March 2017, Child was placed with her maternal aunt in kinship care. At the adjudicatory hearing, a social worker from CHOP testified that Mother had taken Child to the hospital seven times for physical examinations, claiming that various cavities of Child's body were infested with bugs. The court was concerned about Mother's mental health due to the fact that no one else involved with Mother's case was able to see the bugs. At the conclusion of the hearing, the court ordered Mother have twice-weekly supervised visits with Child at DHS, and ordered her to undergo a psychological evaluation to assess her "current emotional and behavioral functioning and to make recommendations related to her behavior health treatment needs." Joseph Foote, Ph.D., Psychological Evaluation, 2/10/17. Doctor Foote conducted Mother's psychological evaluation and, as part of his evaluation, Dr. Foote reviewed Child's dependency evaluation, the dependency court's referral and report, the family court docket, and Child's adjudication and disposition. Doctor Foote diagnosed Mother with delusional disorder and recommended Mother undergo individual therapy and a psychiatric evaluation to assess her need for medication.

On March 2, 2017, the Community Umbrella Agency (CUA) developed a single case plan (Plan) for Mother, to include the following: sign consents for her and Child's medical and mental health treatment; comply with CUA case

manager; and attend twice-weekly supervised visits at DHS.  In May 2017, the Plan was amended to add the following objectives:  follow treatment recommendations from Dr. Foote and participate in therapy with a psychiatrist.    In April 2017, Mother began weekly psychotherapy sessions with Gardner Jacobs, M.D., a psychiatrist.  In a June 2017 report, Dr. Jacobs reconfirmed that Mother presented with delusional disorder; however, the doctor noted that her condition had improved with psychotherapy, **recommended that Child be reunified with Mother with supervision**, and also recommended that Mother continue with psychotherapy until there is no return of her delusional disorder for at least six months.  Gardner Jacobs Report, 6/6/17.

At a July 2017 permanency review hearing, the CUA case manager testified that Mother occasionally behaved inappropriately during visits with Child, speaking negatively about Child's caregiver, her maternal aunt.    In October 2017, CUA revised Mother's Plan to include the following objectives: be referred for a parenting capacity evaluation (PCE) and a psychiatric evaluation, and continue psychotherapy with Dr. Jacobs.  At a January 24, 2018 review hearing, it was reported that Mother was not engaged in mental health therapy.[3]  William Russell, Ph.D., prepared a PCE on Mother; Dr. Russell reviewed several materials prior to coming to his medical conclusions.  The materials Dr. Russell reviewed included permanency review orders, Dr. Foote's

---

[3] Mother, however, testified that she had been receiving therapy at the VA hospital.  She did not provide documentation to support this testimony.

psychological evaluation, CUA's revised Plan, and GPS report narratives. Notably, Dr. Russell did **not** review either Dr. Jacobs' treatment records or his expert report to prepare for his evaluation of Mother. As part of his evaluation methodology, Dr. Russell conducted a clinical interview with Mother on January 31, 2018, performed a personality inventory on Mother, and communicated electronically with CUA case manager, Ciera Bradsher. In his April 21, 2018 PCE, Dr. Russell concluded that Mother did not have the capacity to provide safety and permanency to Child due to her untreated mental health issues and made the following recommendations for Mother: (1) actively participate in individual mental health therapy, at least once a week, with a therapist experienced in working with delusional disorder and regular psychiatric services; (2) supervised visitation with Child until Mother demonstrates progress and actively participates in mental health treatment; and (3) if reunification remains a goal, Mother should make herself available for home visits from CUA. William Russell PCE, 4/21/18, at 12.

Ultimately, Dr. Russell found Dr. Foote's initial diagnosis that Mother suffers from delusional disorder "supported based on a review of the records and observations at the time of [his] clinical interview." *Id.* The PCE also indicated that "[Mother] reported there are no longer bugs present in her home." PCE/Forensic Evaluation, 4/21/18, at 3. ***But see id.*** at 11 (Dr. Russell's inconsistent statement that "[Mother] presents with ongoing delusions related to bug infestation in her home, however, indicates that the bug problem within her home has been resolved using her homeopathic

- 5 -

methods."). Despite Mother telling Dr. Russell that there were no more bedbugs in her home, in February 2018, Mother's Plan was revised to add adoption as a concurrent permanency goal. At an April 18, 2018 permanency review hearing, the court found that Mother was in full compliance with her Plan.

In August 2018, Mother began weekly psychotherapy sessions with licensed psychologist, Janeith Burton, Ed.D. Doctor Burton testified that at the time of the hearings she was in private practice and consulting at a local elementary school and at a mental health agency in Philadelphia. Doctor Burton also testified that she had been a certified school psychologist for over 30 years, a licensed psychologist for over 20 years, and had worked in various school districts and at various city agencies where she provided services through the Office of Vocational Rehabilitation for Adults and the Disability Bureau. N.T. Permanency/Goal Change Hearing, 1/11/19, at 17. In her first psychological evaluation, Dr. Burton noted that Mother told her a DHS social worker inspected her home for the presence of bugs and presented documentation of an exterminator having inspected her home. However, Mother told Dr. Burton that she self-exterminated because she was not able to afford an outside extermination service, and "her home is now free of any bug issues." Janieth Burton, Ed.D, Psychological Evaluation, 8/28/18, at 2. Although Mother disclosed to Dr. Burton that she had "obsessive concern or possible delusions," Dr. Burton testified that during her evaluation of Mother she did not believe that she "present[ed] with delusional thought" and noted

that Mother "reports that she no longer is focused upon th[e] issue [of bug infestation in her home]." *Id.* at 4. Doctor Burton diagnosed Mother with adjustment disorder. Only one month later, in September 2018, Mother's plan was revised to change the permanency goal to adoption.

In January 2019, the court held a status goal change/termination hearing; at the conclusion of the hearing, CUA caseworker Ciera Bradsher and counsel for DHS indicated that the agency had changed the goal to adoption. *See* N.T. Permanency Hearing, 1/11/19, at 11, 35. At the January 2019 hearing, Dr. Burton testified that she had been providing Mother therapy on a weekly basis for five months, that Mother had told her Child had been taken from her a year-and-a-half earlier, that CHOP determined Mother was erratic, and that Child was adjudicated dependent due to some confusion about how Mother was medicating Child. Doctor Burton testified that she believed Mother suffered from adjustment disorder, not delusion disorder, and recommended Child be returned to Mother.

On February 6, 2019, DHS filed a petition to involuntarily terminate Mother's parental rights to Child under sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act[4] and a petition for goal change to adoption. Termination and goal change hearings were held on the petitions on April 8,

_____

[4] 23 Pa.C.S. §§ 2101-2938.

2019, June 4, 2019, and July 10, 2019.[5]  Mother's treating psychiatrist (Dr. Burton), an expert in child adolescent family psychology and parental capacity (Dr. Russell), Child's therapist, Child's CUA case manager (Ciera Bradsher), and Mother testified at the hearings.  At the conclusion of the hearings, the court found that DHS met its burden and entered an order involuntarily terminating Mother's parental right pursuant to 23 Pa.C.S. §§ 2511(a)(1),

_____

[5] Guardians *ad litem*, Reginald Allen, Esquire, and Cuerley Cole, Esquire, and Special TPR Counsel, Lue Frierson, Esquire, represented Child's best interests and legal interests, respectively, at the termination and goal change hearings. **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 2018 PA Super 334 (Pa. Super. filed Dec. 10, 2018) (en banc); **but see In Re: T.S., E.S.**, 2018 Pa. LEXIS 4374, 2018 WL 4001825, at *10 (Pa. filed Aug. 22, 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

(2),(5), (8),[6] and (b).[7]  The trial court also entered an order changing Child's

permanency goal from reunification to adoption, concluding that reunification

_____

[6] Under 23 Pa.C.S. § 2511(a), a parent's rights to his or her child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition **either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties**.

(2) The **repeated and continued** incapacity, abuse, neglect or **refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being** and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the **conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time** and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the **conditions which led to the removal or placement of the child continue to exist and termination of**

with Mother was not a viable option based on Mother's inability to "adequately care for [C]hild" and where "the best interests of [C]hild . . . [which] includes who is performing the daily parental duties for this child[,] [is] the pre-adoptive parent, the aunt[.]"  N.T. Termination/Goal Change Hearing, 7/10/19, at 49-50.  Mother filed timely notices of appeal[8] and *pro se* court-ordered Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal that were later amended by counsel.

---

**parental rights would best serve the needs and welfare of the child**.

23 Pa.C.S. §§ 2511(a)(1), (2), (5), & (8) (emphasis added).

[7] In terminating the rights of a parent under section 2511(b),

> The court . . . shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

[8] By filing two separate notices of appeal with one docket number on each notice, Mother has complied with the dictates of ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018), which held that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each of those cases."  ***See also*** Pa.R.A.P. 341(a).

On appeal, Mother raises the following issues for our review:

(1)    Did the trial court abuse its discretion, when it involuntarily terminated [her] parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), [](2), [](5), and [](8)?

    (a)    Was the evidence sufficient for the court to find, by clear and convincing evidence, to terminate [M]other's parental rights under §[]2511(a)(1), [](2), [](5), and [](8)?

(2)    Did the trial court abuse its discretion, when it determined that terminating [M]other's parental rights would serve [C]hild's physical and emotional needs and welfare pursuant to 23 Pa.C.S.A. § []2511(b)?

    (a)    Was the evidence sufficient for the court to find, by clear and convincing evidence, that termination best serves [C]hild's physical and emotional needs and welfare under § []2511(b)?

(3)    Did the trial court abuse its discretion and violate [M]other's right to due process by preventing [M]other's counsel from putting into the record [M]other's mental health and/or medical expert reports which indicated that [M]other did not suffer from a delusional disorder and that [C]hild should be returned to [M]other's custody?[9]

(4)    Did the trial court abuse its discretion, when it changed the goal to adoption?

    (a)    Was there clear and convincing evidence that adoption would best serve [C]hild's physical and emotional needs and welfare?

Appellant's Brief, at vii-viii.

---

[9] Mother's counsel concedes in her brief that the court did not abuse its discretion with regard to this issue, acknowledging that "[u]pon a more careful review of the record, it is clear that the reports prepared by Dr. Jacobs and therapist Burton recommending reunification were admitted into the record." Appellant's Brief, at 16.  Thus, we need not further address it on appeal.

With regard to a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court; the parent's rights are secondary. *In the Interest of M.T.*, 101 A.2d 1163, 1173 (Pa. Super. 2014). Moreover,

> [t]he standard of review for an order changing the placement goal of a dependent child is abuse of discretion. *In the Interest of: J.H.*, 788 A.2d 1006 (Pa. Super. 2001). In deciding a change of placement goal request, the trial court must consider the best interest of the child and whether the parent has substantially complied with the family service plan goals. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001).

*In the Interest of K.D.*, 871 A.2d 823, 825 n.1 (Pa. Super. 2005). In dependency cases, the appellate court is required to accept the findings of fact and credibility determinations of the trial court that are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted). Finally, the appellate court is not required to accept the trial court's inferences or conclusions of law. *Id.*

After reviewing the certified record, including the notes of testimony from the permanency/goal change status hearing, the multi-day termination hearings, the parties' briefs, and relevant statutes and case law, we reverse the trial court's order changing the goal to adoption. We simply cannot conclude that the trial court's findings are supported by competent evidence of record. *In re In the Interest of S.H.*, 879 A.2d 802, 206 (Pa. Super. 2005).

We first note that the trial court's Rule 1925(a) opinion is completely silent regarding its decision to change the goal from reunification to

- 12 -

adoption.[10]   In considering a goal change motion, the trial court has a responsibility to look to the best interests of Child and not those of Child's parents. *In the Interest of R.J.T.*, 9 A.3d 1179, 1183-84 (Pa. 2010).  In addition, it is well-established that at a minimum, a court must determine *all* of the following at a permanency hearing[11] prior to changing a goal:[12]

> **(1)** The continuing necessity for and appropriateness of the placement.
>
> **(2)** The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> **(3)** The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> **(4)** The appropriateness and feasibility of the current placement goal for the child.
>
> **(5)** The likely date by which the placement goal for the child might be achieved.
>
> **(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.**

---

[10] Notably absent from the trial court's goal change decision is a discussion regarding Dr. Jacobs' June 2017 report that noted Mother's condition had improved with psychotherapy and recommended that Child be reunified with Mother with supervision.

[11] Permanency hearings are "for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child may be achieved and whether placement continues to be best suited for the safety, protection and physical and mental and moral welfare of the child."  *In re Adoption of S.E.G.*, 901 A.2d 1017, 1027 (Pa. 2006) (citing 42 Pa.C.S. § 6351(e)(1)).

[12] Ironically, in granting a goal change, the court relieved DHS of its obligation to provide Mother with services. *In the Matter of S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008).  However, the court failed to first assess whether DHS had actually made reasonable efforts to finalize Mother's permanency plan.

- 13 -

**(6)** Whether the child is safe.

**(7)** If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

**(8)** The services needed to assist a child who is 14 years of age or older to make the transition to successful adulthood.

**(8.1)** Whether the child continues to meet the definition of "child" and has requested that the court continue jurisdiction pursuant to section 6302 if the child is between 18 and 21 years of age.

**(8.2)** That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C. § 675(5)(h)).

**(9) If the child has been in placement for at least 15 of the last 22 months** or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, **whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child** <u>unless</u>:

**(i)** the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

**(ii)** the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

**(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent**, guardian or custodian **within the time frames set forth in the permanency plan.**

For children placed in foster care on or before November 19, 1997, the county agency shall file or join a petition for termination of parental rights under this subsection in accordance with section 103(c)(2) of the Adoption and Safe Families Act of 1997 (Public Law 105-89, 111 Stat. 2119).

**(10)** If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

**(11)** If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

**(12)** If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

> (i) the caregiver is following the reasonable and prudent parent standard; and

> (ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S. § 6351(f) (emphasis added).

Based upon the conclusions reached by the court under subsection (f) of section 6351 and all relevant information presented at the permanency hearing, the court shall determine "[i]f and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent . . . is not best suited to the safety, protection and physical, mental and moral welfare of the child." **Id.** at § 6351(f.1). Finally, on the basis of the determination made under subsection (f.1), "the court shall order the continuation, modification or termination of

- 15 -

placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." *Id.* at § 6351(g).

Under the current circumstances, where Mother was faithfully attending every supervised, semi-weekly visit with Child, was cooperative with her DHS and CUA services, and believed that she was receiving appropriate mental health treatment, we cannot conclude that the evidence supports the court's decision to change Child's placement goal to adoption.

Child has been in placement since January 2017; she had been in kinship care for two years at the time of the permanency/goal change hearing. We recognize that the policy underlying the Juvenile Act is to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). An agency is also not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). However, an agency must redirect its efforts towards placing the child in an adoptive home only after "the child welfare agency **has made reasonable efforts** to return a foster child to his or her biological parent, but those efforts have failed[.]" *In re G.P.-R.*, 851 A.2d 967 (Pa. Super. 2004) (emphasis added). The evidence does not support the conclusion that DHS or CUA made **reasonable efforts** to return Child to Mother where its caseworkers failed to inform Mother for more than four months that her chosen psychologist, Dr. Burton, was not appropriately treating her for delusional disorder as per the Plan. In fact,

Mother had been treated by Dr. Burton weekly for four and a half months at the time DHS changed the goal to adoption and more than five months at the time the termination petition was filed. At no time during her treatment with Dr. Burton did a caseworker or CUA worker advise Mother either that her therapy sessions were not addressing the mental health concerns attendant to her service plan goals, or that Dr. Burton was not an appropriate therapist to achieve those goals.

Contrary to CUA caseworker Bradsher's concern that Dr. Burton may not have received Dr. Russell's PCE, Dr. Burton testified that prior to meeting with Mother she *had* reviewed Dr. Russell's PCE, as well as Dr. Foote's psychological evaluation and a report from Americi Mental Health Agency, and that based on that information, she devised Mother's therapy goals and overall treatment plan. *Id.* at 18-19. Moreover, Dr. Burton disagreed with counsel's question that "[a]fter reading that evaluation [she was] discounting some information that was provided [in] it." *Id.* at 19. Rather, Dr. Burton explained that after reviewing all of the background information on Mother, in addition to Mother explaining to her that she had a bug infestation problem, Dr. Burton "came up with her own . . . diagnoses . . . at th[at] particular time." *Id.* at 19-20. In fact, Dr. Burton specifically stated that she did **not** discount the

information from CHOP doctors that they failed to find any evidence of bug infestation on or in Child's body. *Id.* at 28.[13]

With regard to finding a qualified psychologist to comply with DHS' plan, Mother testified at the final termination hearing:

[CUA caseworker] Miss Bradsher did come up with some doctors, I needed to have an authorized rep. I called Dr. Foot[e]. I called Dr. Russell to see if they would give me a prescription or authorized rep. They refused to. These doctors that she presented were busy. **She never came up with another suggestion for any doctor.**

\* \* \*

I went and found three psychiatrists to have myself evaluated for delusions and any other thing that may be considered mental illness. I looked up the information and found them myself.

**When I was not diagnosed as delusion[al] and no treatment was issued to me, I was told by Ms. Bradsher that I still needed to go to therapy. And if I didn't do it within a timely manner, that my child would be taken immediately.**

**So then I got on the computer, and I looked up for therapy for delusions, and Dr. Burton's name came up. I started therapy there.**

\* \* \*

**[]Your Honor, I feel as though I followed the [c]ourt instructions. I did everything that I could possibly do that**

_____

[13] We look with disfavor upon the trial court repeatedly interrupting Dr. Burton while she testified on direct examination. *See* N.T. Permanency Hearing, 1/11/19, at 21-22. This is especially troubling as it prevented Dr. Burton from fully explaining to what extent, during her sessions, she explored Mother's issues of bug infestation with regard to Child—the exact issue the court says remains unresolved with Mother and requires termination.

**was listed for me to do, that the [c]ourt has allowed me to do.**

N.T. Termination Hearing, 7/10/19, at 17, 21-22, 33 (emphasis added).

CUA worker Bradsher testified that in her opinion she did not believe that Mother had addressed her mental health concerns as stated in Dr. Russell's April 18, 2018, PCE. *See* N.T. Termination Hearing, 6/4/19, at 32 ("So, to address the mental health concerns identified in the PCE [they] remain[] an objective? Yes."). Similarly, although the child advocate argued that she did not think that Mother's "[bug] issue had been properly addressed," *id.* at 36, the fact remains that Mother faithfully complied with DHS' goal of attending therapy, as well as Dr. Russell's PCE recommendation that she "participate in mental health services, including at least weekly individual therapy experienced in working with delusional disorder and regular psychiatric services." Russell PCE, at 4/21/18, at 12. However, while Bradsher and Dr. Russell may have had specific treatment in mind (i.e., therapy to address the "issue of the bugs"), the court overlooked the fact that neither Mother's Plan nor Dr. Russell's PCE recommendation required that Mother specifically discuss her bug delusion at therapy sessions. It is simply unreasonable to place the burden on Mother to convey exactly what type of psychiatric treatment (i.e., primarily discuss bedbug issue) she is required to receive under the Plan where her mental health issues were the cause of Child being declared dependent and, ultimately, the basis for the court's decision to terminate her parental rights to Child.

Moreover, in its Rule 1925(a) opinion, the trial court states that "Mother . . . refused to participate in any mental health treatment offered through CUA [and i]nstead, . . . chose to retain her own psychiatrist."  This simply is not supported in the record.  Mother testified that she was unable to afford the cost of treatment of several of the psychiatrists named on CUA's list, asked caseworker Bradsher for alternatives and, when the caseworker did not respond, chose to find her own mental health provider with whom she immediately began treating weekly.[14]  Caseworker Bradsher did not refute this testimony and, in fact, testified that Mother chose Dr. Burton from a list that she had provided her.

Accordingly, we conclude that the trial court erred in changing the goal from reunification to adoption where the evidence simply does not support the change.[15]  *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007).  In particular, we find that:  (1) DHS and CUA did not make "reasonable efforts" to return Child to Mother; (2) the trial court did not consider whether Mother had substantially complied with the family service plan goals; (3) the trial court

---

[14] Neither the trial court nor Appellee mentions the fact that Dr. Gordon, a psychiatrist who treated Mother for several months beginning in April of 2017, recommended that Child be returned to Mother with supervision.

[15] Notably, 42 Pa.C.S. § 6351 does not require that a goal change precede the filing of a termination petition.  *S.E.G.*, *supra*.  Rather, agencies can file termination petitions, in furtherance of adoption, even though the permanency goals remains reunification.  *Id.* at 1029.  This process is referred to as "concurrent planning," a policy engendered by the 1998 amended version of the Juvenile Act to prevent prolonged foster care and foster care drift.  *In the Interest of R.J.T.*, 9 A.3dat 1189.

rushed to change Child's permanency goal where Mother was making progress toward reunification and/or where it was uncertain whether reunification would be futile and/or contrary to Child's best interest; (4) Child's family was not provided with the necessary services to achieve Child's safe return to Mother within the time frames set forth in the permanency plan; and (5) the court held Mother to a specific requirement to discuss bug delusions at her therapy session when she had never been ordered to do so. **In re G.P.-R.**, **supra**; **In re R.T.**, **supra**; 42 Pa.C.S. § 6351(f)(9)(iii). **Cf. In re J.D.H.**, 171 A.3d 903 (Pa. Super. 2017) (trial court did not abuse discretion by changing child's permanency goal to adoption where mother made no progress after child entered foster care, mother had regressed in parenting abilities, child entered foster care several days after birth and had not resided with mother for any significant period of time, and child had bonded with foster parents and was thriving in their care); **D.C.D.**, **supra** (family reunification not realistic goal where Father was incarcerated prior to child's birth, will remain incarcerated until child is at least 7 years of age, child has been with foster family since shortly after her birth and has bonded with foster family).

We next address whether there was sufficient evidence to terminate Mother's parental rights under sections 2511(a) and (b) of the Adoption Act.

In a proceeding to involuntarily terminate parental rights,

the burden of proof is upon the party seeking termination to establish by "clear and convincing evidence" the existence of grounds for doing so. **The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to**

**come to a clear conviction, without hesitance, of the truth of the precise facts in issue.**

* * *

In cases of involuntary termination of parental rights, the standard of appellate review is limited to the determination of whether the decree of the Pennsylvania Orphans' Court is supported by competent evidence. Where the hearing court's findings are supported by competent evidence of record, "we must affirm the hearing court even though the record could support an opposite result."

*In the Interest of A.L.D.*, 797 A.2d 326, 336 (Pa. Super. 2002) (emphasis added) (citation omitted).

Significantly, where a child is in foster care, a parent has the affirmative duty to "work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for her to be capable of performing her parental duties and responsibilities." *In re: G.P.-R.*, 851 A.2d 967, 977 (Pa. Super. 2004). Mother fulfilled her obligation of obtaining the services that DHS and CUA outlined for her in her Plan. The issue in dispute, which Mother precisely states in her brief, is "[w]hether or not [she] participated in the *appropriate* mental health therapy[.]" Appellant' Brief, at 2. Because neither the Plan nor any psychological recommendation indicated that Mother was required to specifically discuss her "bedbug issues" during therapy and where both Mother and Dr. Burton acknowledge that the issue was discussed to an extent during her treatment, the court erred in concluding that termination was proper under section 2511(a).

After an exhaustive review of the record, we find that DHS did not prove "by clear and convincing evidence" that the grounds to terminate Mother's parental rights exist under sections 2511(a). While we are aware that neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights, this Court has observed that **the provision or absence of reasonable efforts *may be relevant* to a court's consideration of both the grounds for termination and the best interests of the child**. *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (emphasis added), citing *In re Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006). The lack of reasonable efforts by DHS in the instant case is a significant consideration in our decision to reverse the order terminating Mother's parental rights, especially where Mother substantially complied with her court-ordered Plan. *See D.C.D.*, *supra* at 672 ("[A] court my find an agency's lack of assistance to a parent relevant to whether a parent's incapacity 'cannot or will not be remedied by the parent.'"). Specifically, we find this fact determinative in our conclusion that the evidence was not "so clear, direct, weighty, and convincing" to prove that: Mother evidenced an intent to relinquish her parental rights to Child under section 2511(a)(1); the conditions and causes of Mother's incapacity cannot or will not be remedied by her under section 2511(a)(2); or the conditions that led to Child's placement continue to exist and/or termination of Mother's rights would best serve the needs and welfare of Child under sections 2511(a)(5) and (a)(8).

In addition to considering the agency's efforts, there is also further support for our decision to reverse the order terminating Mother's parental rights. First, Mother did, in fact, cooperate with the services outlined by DHS and CUA. *In re: G.P.-R.*, *supra* at 978. As previously stated, however, the issue is whether the therapy she received was "appropriate." Second, the psychological reports relied upon by the court to conclude that Mother still suffers from delusional disorder are stale and incomplete. Specifically, Dr. Russell's PCE, which included two interviews with Mother, occurred in April 2018 – eleven months before the first termination hearing. Further, Dr. Russell never considered the fact that Dr. Jacobs acknowledged that Mother had made significant progress in her psychotherapy and recommended reunifying Mother and Child, albeit with supervision. Instead, Dr. Russell chose to adopt Dr. Foote's diagnosis of Mother, even though Dr. Foote had never treated her. Moreover, Dr. Foote's psychological evaluation, the first psychological report to diagnose Mother with delusion disorder, recommended that Mother participate in mental health services, occurred in February 2017, more than one year before Dr. Russell's report issued.

Further, while Dr. Russell testified at the termination hearing that even after reviewing Dr. Burton's more recent reports he would not change his initial diagnosis of Mother's delusion disorder, we cannot conclude that his professional opinion supports termination where: (1) he has not personally evaluated Mother since April 2018 or actually treated her; and (2) where he

relied upon Dr. Burton's professional evaluation,[16] yet the court concluded that Dr. Burton "did a sloppy job in treating [Mother and] did not have enough information to make a [proper] evaluation o[f M]other's mental health." N.T. Termination/Goal Change Hearing, 7/10/19, at 47.[17]

Finally, we cannot accept the court second-guessing Dr. Burton's adjustment disorder diagnosis where: Dr. Burton is a competent psychologist

---

[16] The evidence cannot be "clear and convincing" where DHS relied, in part, upon Dr. Burton's analysis in crediting Dr. Russell's termination testimony, and then discredited her professional work and opinion to find that Mother had not addressed her mental health issues appropriately, warranting termination.

[17] Having determined that termination was not appropriate under section 2511(a), we need not review whether termination was proper under section 2511(b). We would note, however, that Ms. Bradsher testified that visits between Mother and Child typically go well and that Mother has never missed a visit with Child. Moreover, while Ms. Bradsher testified that there would be no irreparable harm to Child if the bond with Mother was broken, she testified that she came to this conclusion based on Child's answer to the question of "who[m] she wants to stay with" and if "[Child] would be upset if she isn't returned home." N.T. Termination Hearing, 6/4/19, at 46. There was no testimony that Child understood what, in fact, terminating Mother's parental rights means (as opposed to "not being able to go home") and whether Child understands the concept of adoption.

We recognize that the existence of some bond between a child and a biological parent does not necessarily preclude termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). The question is whether an existing bond between the Child and Mother is "worth saving or whether it could be sacrificed without irreparable harm to the Child." *Id.* Moreover, under subsection 2511(b), a court need not only consider the parent-child bond, but "can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citation and internal quotation marks omitted).]

- 25 -

with whom Mother had been treating for over four months; Mother shared with Dr. Burton that Child was removed from her due to "obsessive concern or possible delusions;" and, throughout the course of treatment, Mother ultimately "report[ed] that she no longer is focused upon th[e] issue [of bug infestation in her home]." Doctor Burton's differential diagnosis does not make her incompetent to treat Mother, especially where Mother complied with her mental health objectives under the Plan, DHS and CUA workers never advised Mother her treatment was not compliant with the Plan, and where Dr. Burton's recommendation to reunify Child with Mother was consistent with Mother's only other treating psychologist.

Here, the trial court concluded that since Child has been in placement, Mother has been unable to adequately address her significant mental health issues, which makes her "no longer capable of caring for Child." N.T. Termination/Goal Change Hearing, 7/10/19, at 50. In coming to its decision, the trial judge stated that he found DHS' witnesses credible and gave the testimony from these witnesses great weight. *Id.* at 47. On the other hand, the court found Mother's testimony "rambling," did not know what to believe of what she said in court, and found it "obvious . . . that [Mother] has serious mental health issues." *Id.* We understand that as a reviewing court we are required to "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re C.M.C.*, 140 A.3d 699, 704 (Pa. Super. 2016) (citation omitted). However, where those factual findings are not supported by the record or where the court's legal conclusions

amount to an error of law or an abuse of discretion, we must vacate. Instantly, the only two psychiatrists who actually treated Mother both agreed that she could be reunified with Child, with supervision, and that she had made significant progress during therapy.

Accordingly, we find that the evidence supporting termination of Mother's parental rights is not clear and convincing and, thus, vacate that order. [18] The court's conclusion that Mother still suffers from delusion disorder and is incapable of parenting Child is not supported by clear and convincing evidence where the evidence relied upon is stale, where the court failed to credit Dr. Burton as a competent psychologist, and where the agency failed to make reasonable efforts to provide Mother services to achieve her mental health goals under the service plan despite her admitted progress. *In re D.C.D.*, *supra* at 675 (holding that "[While] nothing in the language or the purpose of [s]ection 6351(f)(9) forbids the granting of a petition to terminate parental rights, under [s]ection 2511, as a consequence of [an] agency's failure to provide reasonable efforts to a parent[,] . . . **reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision**[."]) (emphasis added); *R.J.T.*, *supra*.

---

[18] At a minimum, the court should have required Dr. Russell conduct an updated PCE on Mother.

Simply put, the evidence is not so "clear, direct, weighty and convincing" as to require termination. *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Orders vacated.[19]  Case remanded for entry of new permanency order maintaining Child's prior placement goal of reunification/adoption and for further permanency review hearings in juvenile court.  Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 5/20/2020*

---

[19] We note that in vacating the goal change and termination orders, we are not placing Child back in Mother's custody.  Moreover, DHS has the opportunity to file another petition to change the goal or terminate parental rights, if necessary, with sufficient clear and convincing evidence as is required under the Adoption Act.